562        August 6, 2021        No. 25

## IN THE OREGON TAX COURT
## REGULAR DIVISION

## GLOBAL HOOKAH DISTRIBUTORS, INC.,
a North Carolina corporation,
*Plaintiff,*

*v.*

## DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5272)

On cross-motions for summary judgment, Plaintiff raised two issues regarding Oregon's Tobacco Products Tax (TPT), one statutory and one constitutional. Plaintiff argued that the "wholesale sales price" used to determine tax liability under the TPT should not include certain shipping and handling charges. The court held that the exclusion of charges from the "wholesale sales price" will be based on consideration of four factors: (1) charges for identifiable services are more likely excludable; (2) charges for services performed by a third party are more likely excludable; (3) third-party service charges are more likely excludable if passed on at no more than a reasonable markup; and (4) charges incurred after title to the tobacco product passed to the taxpayer are more likely excludable. The court concluded that there was insufficient evidence in the record to rule on the statutory issue in this case. Plaintiff also argued that the TPT violated the US Constitution's Commerce Clause. The court concluded that Plaintiff's sales of tobacco products to Oregon customers established a substantial nexus with Oregon, the measure of the TPT is fairly related to the activity of selling tobacco products, and that imposing the TPT does not unduly burden interstate commerce. Therefore, the imposition of the TPT did not violate the Commerce Clause.

Oral argument on cross-motions for summary judgment was held by telephone on May 27, 2020.

Amber A. Beyer, Cosgrave Vergeer Kester LLP, filed the motion and Julie A. Smith, Cosgrave Vergeer Kester LLP, Portland, argued the cause for Plaintiff.

Kristen M. Gallino, Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Defendant.

Decision rendered August 6, 2021.

### ROBERT T. MANICKE, Judge.

Plaintiff (taxpayer) brings statutory and constitutional challenges to Defendant's (the department's) assessments of Oregon's Tobacco Products Tax (the TPT) on tobacco

products other than cigarettes, codified at ORS 323.500 to 323.645 (the TPT Act or Act).[1] The tax periods at issue are the 16 quarters ending December 31, 2008, and June 30, 2009 through December 31, 2012.

## I.   INTRODUCTION & FACTS

### A.   *Overview of Taxpayer's Business*

Unless noted otherwise, the facts are uncontested for the periods at issue. Taxpayer is a North Carolina corporation whose commercial domicile and sole place of business are in Charlotte, North Carolina. Taxpayer buys and sells "shisha" (a form of tobacco that is smoked in hookahs) and nontobacco products (such as hookahs, accessories to hookahs, and charcoal). Taxpayer does not repackage tobacco products; for example, if it buys a certain variety of shisha in 250-gram jars, it sells those jars of shisha to customers.

A business wishing to order from taxpayer first submits, through taxpayer's website, an application containing business information and copies of the business's state tobacco license and sales tax license, if applicable. After taxpayer approves the application, the business customer may place orders over email, phone, and fax. Customers other than businesses typically create an account on taxpayer's website, enabling them to place and track orders through the site.

Taxpayer conducts all of its operations at warehouses in North Carolina and ships its goods via U.S. mail or common carrier from there to customers throughout the world. Taxpayer has a website and a presence on Facebook and Twitter that are accessible by anyone. Taxpayer sends newsletters by email a few times a year regarding new products or upcoming sales; newsletters go to customers who

---

[1] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to the 2009 edition. Although the 2009 edition was published after the first period at issue, the TPT Act was, for purposes of this case, materially the same as the 2007 version of the Act. *Cf.* Or Laws 2009, ch 717 (adding definition of "moist snuff," imposing tax on "moist snuff," and imposing various administrative requirements on manufacturers of smokeless tobacco products). Except for two amendments not relevant to this case, the Act was not amended between 2009 and 2012. *See* Or Laws 2011, ch 389, § 5 (pertaining to warrants); Or Laws 2011, ch 661, § 8 (same).

contact taxpayer seeking to subscribe. None of taxpayer's employees has entered Oregon on business.

Taxpayer acknowledges that it is a "distributor" of "tobacco products" as defined by Oregon law. *See* ORS 323.500(7) (defining "distributor"); ORS 323.500(14) (defining "tobacco products"); ORS 323.520(1) (imposing licensing requirement for distributors). Taxpayer obtained an Oregon distributor license after receiving a request around 2007 from an Oregon business customer who had been purchasing nontobacco products from taxpayer but who wanted to purchase tobacco products as well. *See* ORS 323.530. In the course of obtaining its license, taxpayer was directed by a state employee to register with the Oregon Secretary of State as a foreign corporation, and taxpayer did so. Taxpayer has a registered agent in Oregon. Taxpayer has filed a quarterly tobacco products tax return, and remitted all reported TPT, for each of the periods at issue.

Taxpayer's total sales to customers in Oregon during the calendar year 2008 amounted to less than $10,000 in gross sales and fewer than 20 invoiced transactions, each including charges for shisha, charges for goods other than shisha, and other charges, all with two customers. Taxpayer had similar figures during the calendar year 2009: slightly more than $10,000 in gross sales and fewer than 20 invoiced transactions, all with one of the customers to which it sold in 2008. Taxpayer sent one or more invoices to the same customer each month from February 2008 through December 2009. The numbers increased for 2010 to less than $35,000 in gross sales, fewer than 40 transactions, and four customers. For 2011, taxpayer had about $80,000 in gross sales, around 60 transactions, and six customers. For 2012, taxpayer had around $180,000 in gross sales, about 100 transactions, and nine customers. As a percentage of taxpayer's overall gross sales, taxpayer's gross sales to Oregon customers ranged from 0.5 percent to 2.0 percent.

B.  *Taxpayer's Suppliers' Invoices*

The invoices taxpayer receives from its suppliers for tobacco products ordinarily have a line item for each type of product. That line item shows the unit of that product

that taxpayer has ordered (for example, a jar of a certain weight of a certain type of shisha), the number of such units ordered, the price per unit, and the total price for the quantity of units ordered. Similar line items for nontobacco products, such as charcoal, hookahs, or other smoking-related equipment, sometimes are included on the same invoice with tobacco products. Supplier invoices also often show one or more of the following charges that the court will refer to as the "Charges at Issue" in taxpayer's statutory claim: federal tax, shipping fees, custom fees, duties, transportation, palletizing, warehousing, customer service, advertising, documentation and other charges. An invoice typically groups all Charges at Issue into a single line item, although some invoices list shipping or other discrete types of Charges at Issue as separate line items. Most of the invoices do not show a breakdown of the Charges at Issue by product; for example, an invoice that shows shipping as a Charge at Issue will show only one shipping charge for all items on the invoice, not separate charges for shipping of each product type or each unit shown on the invoice. In summary, each invoice clearly shows a stated price for each item of tobacco products and a stated price for each item of nontobacco products. However, the stated amounts for Charges at Issue are, on most invoices, "bundled," both in the sense that multiple types of Charges at Issue are included in a single amount, and in the sense that the Charges at Issue are not allocated among the various products on the invoices.

## C.    *The Department's Audit of Taxpayer's TPT Returns*

For shisha, the TPT rate is "sixty-five percent of the wholesale sales price," which is defined as "the price paid for untaxed tobacco products to or on behalf of a seller by a purchaser of the untaxed tobacco products." *See* ORS 323.505 (1)(c); ORS 323.500(16). On its TPT returns for the periods at issue, taxpayer calculated its "wholesale sales price" for tobacco products sold into Oregon using the line-item price for those products as shown on the invoices from suppliers. Taxpayer's calculation did not take into account any of the Charges at Issue. In an audit in 2013, the department recalculated taxpayer's reported tax liability by including the Charges at Issue in the "wholesale sales price."

The department issued notices of deficiency, which, for all periods at issue, impose total additional TPT liability of $57,501.92, plus interest, as of October 25, 2013. Taxpayer appealed to the Magistrate Division and now appeals from an adverse decision there. The parties have filed cross-motions for summary judgment.[2]

## II.   STANDARDS OF REVIEW

This division of the court reviews a magistrate's decision *de novo* based on the record developed in this division. ORS 305.425(1); *see also* ORS 305.501(6). The court grants a motion for summary judgment only if "the pleadings * * * declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C. *See Christensen II v. Dept. of Rev.*, 23 OTR 155, 162-63 (2018) (citing *Two Two v. Fujitech America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014)). "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable [factfinder] could [find] for the adverse party on the matter that is the subject of the motion for summary judgment." TCR 47 C. "A material fact is 'one that, under applicable law, might affect the outcome of a case.'" *Ghiglieri v. Tomalak*, 304 Or App 717, 718, 469 P3d 262 (2020) (quoting *Zygar v. Johnson*, 169 Or App 638, 646, 10 P3d 326 (2000), *rev den*, 331 Or 584 (2001)). As to each party's motion, the adverse party has the burden of producing evidence on any issue raised in the motions as to which the adverse party would have the burden of persuasion at trial. *Id*.

## III.   ISSUES

(1)   Statutory issue: Does the "wholesale sales price" of the tobacco products taxpayer sold to Oregon customers include the Charges at Issue?

---

[2] Taxpayer argues that the department has moved for only partial summary judgment because it did not argue in its Motion for Summary Judgment that the TPT meets the "fairly related" prong of the *Complete Auto* test (*see* 24 OTR at 583). The court does not treat the department's motion as a motion for partial summary judgment. The department argued that taxpayer's "constitutional objections to taxation in Oregon are without merit." The department specifically addressed the "fairly related" prong in its response, and taxpayer responded on reply.

(2)   Constitutional issue: Does the Commerce Clause of the United States Constitution prevent the department from subjecting taxpayer to the Tobacco Products Tax for some, if not all, of the periods at issue?

## IV.   ANALYSIS

Taxpayer makes two claims, one statutory and one under the United States Constitution. First, taxpayer asserts that the statutory definition of the "wholesale sales price" of tobacco products refers to the per-unit price of a tobacco product and excludes all of the Charges at Issue. The department argues that all of the Charges at Issue are included in the wholesale sales price because a seller would not have sold the shisha to taxpayer if taxpayer had not paid those charges. Taxpayer's statutory claim would eliminate the deficiencies because all of the department's assessments are based on increasing the tax base by the amount of the Charges at Issue. Taxpayer's second claim is that, as applied to taxpayer, the TPT violates the Commerce Clause of the United States Constitution for at least some of the periods at issue. *See generally* US Const, Art I, § 8, cl 3. Taxpayer's second claim would both eliminate the assessed deficiencies and result in a refund of tax that taxpayer paid when it filed its returns.

The court begins with taxpayer's statutory claim. *Health Net, Inc. v. Dept. of Rev.*, 22 OTR 128, 134 (2015), *aff'd*, 362 Or 700, 415 P3d 1034 (2018) ("Under the 'first things first' doctrine, Oregon courts first examine state statutory issues and state constitutional claims before addressing any federal statutory or federal constitutional claims."). When construing statutes, the court applies the analytical steps set forth in *State v. Gaines*, starting with the text and context, proceeding to the legislative history to the extent useful, and, if the legislature's intent remains unclear, consulting general maxims of statutory construction. 346 Or 160, 171-72, 206 P3d 1042 (2009).

A.   *Statutory Issue*

The TPT Act governs the taxation of tobacco products other than cigarettes. ORS 323.505 imposes the tax and specifies the tax base and rates for various tobacco products:

"(1)   A tax is hereby imposed upon the distribution of all tobacco products in this state. The tax imposed by this section is intended to be a direct tax on the consumer, for which payment upon distribution is required to achieve convenience and facility in the collection and administration of the tax. The tax shall be imposed on a distributor at the time the distributor distributes tobacco products.

"(2)   The tax imposed under this section shall be imposed at the rate of:

"(a)   Sixty-five percent of the wholesale sales price of cigars, but not to exceed 50 cents per cigar;

"(b)   One dollar and seventy-eight cents per ounce based on the net weight determined by the manufacturer, in the case of moist snuff, except that the minimum tax under this paragraph is $2.14 per retail container; or

"(c)   Sixty-five percent of the wholesale sales price of all tobacco products that are not cigars or moist snuff.

"* * * * *

"(5)   No tobacco product shall be subject to the tax if the base product or other intermediate form thereof has previously been taxed under this section."

Key terms are defined in ORS 323.500:

"(3)   'Consumer' means any person who purchases tobacco products in this state for the person's use or consumption or for any purpose other than for reselling the tobacco products to another person.

"* * * * *

"(6)   'Distribute' means:

"(a)   Bringing, or causing to be brought, into this state from without this state tobacco products for sale, storage, use or consumption;

"(b)   Making, manufacturing or fabricating tobacco products in this state for sale, storage, use or consumption in this state;

"(c)   Shipping or transporting tobacco products to retail dealers in this state, to be sold, stored, used or consumed by those retail dealers;

"(d)   Storing untaxed tobacco products in this state that are intended to be for sale, use or consumption in this state;

"(e)   Selling untaxed tobacco products in this state; or

"(f)   As a consumer, being in possession of untaxed tobacco products in this state.

"(7)   'Distributor' means:

"(a)   Any person engaged in the business of selling tobacco products in this state who brings, or causes to be brought, into this state from without the state any tobacco products for sale;

"(b)   Any person who makes, manufactures or fabricates tobacco products in this state for sale in this state;

"(c)   Any person engaged in the business of selling tobacco products without this state who ships or transports tobacco products to retail dealers in this state, to be sold by those retail dealers;

"(d)   Any person, including a retail dealer, who sells untaxed tobacco products in this state; or

"(e)   A consumer in possession of untaxed tobacco products in this state.

"* * * * *

"(12)   'Sale' means any transfer, exchange or barter, in any manner or by any means, for a consideration, and includes and means all sales made by any person. It includes a gift by a person engaged in the business of selling tobacco products, for advertising, as a means of evading the provisions of ORS 323.500 to 323.645, or for any other purpose.

"* * * * *

"(14)   'Tobacco products' means cigars, cheroots, stogies, periques, granulated, plug cut, crimp cut, ready rubbed and other smoking tobacco, snuff, snuff flour, moist snuff, cavendish, plug and twist tobacco, fine-cut and other chewing tobaccos, shorts, refuse scraps, clippings, cuttings and sweepings of tobacco and other kinds and forms of tobacco, prepared in such manner as to be suitable for chewing or smoking in a pipe or otherwise, or both for chewing and

smoking, but shall not include cigarettes as defined in ORS 323.010.

"(15) 'Untaxed tobacco products' means tobacco products for which the tax required under ORS 323.500 to 323.645 has not been paid.

"(16) 'Wholesale sales price' means the price paid for untaxed tobacco products to or on behalf of a seller by a purchaser of the untaxed tobacco products."

The TPT Act thus imposes the TPT on any "distributor" at the time the distributor "distributes" tobacco products, except that no TPT applies if the "base product or other intermediate form thereof has previously been taxed under this section." ORS 323.505(5). The tax base is the "wholesale sales price," defined as the "price paid for untaxed tobacco products," except that for cigars the tax base is capped at 50 cents per cigar, and for moist snuff the tax is not measured by wholesale sales price at all, but by the ounce with a minimum tax per retail container. ORS 323.505(2). For shisha, the TPT applies at 65 percent of the wholesale sales price, *i.e.*, the price paid for untaxed shisha. ORS 323.505(2)(c).

The parties dispute whether "the price paid for untaxed tobacco products" includes the Charges at Issue. The court begins with the statute's text. *See Gaines*, 346 Or at 171-72.

1. *Text*

Each party claims support for its position in the plain meaning of "price." The contemporaneous dictionary definition of "price" is, in relevant part:[3]

"2a : the quantity of one thing that is exchanged or demanded in barter or sale for another : a ratio at which commodities and services are exchanged b : the amount of

---

[3] The TPT was enacted in 1985. *See* Or Laws 1985, ch 816. As noted below in the analysis of statutory context, the 1985 act defined "wholesale sales price" as "the *established* price for which a manufacturer sells a tobacco product to a distributor, after any discount or other reduction for quantity or cash." *Id.* at § 15 (emphasis added). In 2003, the legislature replaced that definition with the current text, which does not include an adjective modifying "price." *See* Or Laws 2003, ch 804, § 31. For its text analysis, the court refers to the 2002 edition of *Webster's Third* as contemporaneous with the 2003 amendment. In any event, the definition of "price" available in 1985 was identical. *See Webster's Third New Int'l Dictionary* at 1798 (unabridged ed 1976).

> money given or set as the amount to be given as a consider-
> ation for the sale of a specified thing <the [price] of wheat
> is expected to rise> 3 : the terms or consideration for the
> sake of which something is done or undertaken *** 4 : the
> cost at which something is obtained <the [price] of liberty is
> eternal vigilance> or offered <the [price] of peace was more
> than their spirit could stomach ***[.]"

*Webster's Third New Int'l Dictionary* 1798 (unabridged ed
2002) (emphasis added); *see Comcast Corp. v. Dept. of Rev.*,
356 Or 282, 296 n 7, 337 P3d 768 (2014) (stressing impor-
tance of consulting dictionary definitions contemporaneous
with a statute's enactment). A contemporaneous legal dic-
tionary contains a definition of "price" that the court finds
substantially similar to definition 2b above: "The amount of
money or other consideration asked for or given in exchange
for something else; the cost at which something is bought or
sold." *Black's Law Dictionary* 1207 (7th ed 1999).

Taxpayer argues that the reference to consideration
for "the sale of a specified thing" (or for "something else"
as stated in *Black's*) confirms that only the amount stated
on an invoice as an itemized charge for shisha is the "price
paid for untaxed tobacco products." On the other hand, the
department argues that the price of the shisha *must* include
the Charges at Issue because taxpayer's suppliers would not
have sold the shisha to taxpayer unless taxpayer paid those
amounts as part of its consideration. The court concludes
that the plain meaning of "price" does not compel either
party's position. Although an amount shown on an invoice
as attributable to an item is *evidence* of the amount paid
for that item, nothing in the plain meaning of "price" deter-
mines as a matter of law whether other charges on the same
invoice, or portions of those charges, also constitute "consid-
eration for" the item at issue.

2.  *Context and legislative history*

The court turns to statutory context.[4] Both parties
direct the court to provisions of the TPT Act. *See Unger
v. Rosenblum*, 362 Or 210, 221, 407 P3d 817 (2017) ("[W]e

---

[4] Because the court has found little on point in the legislative history, the
court notes relevant references to legislative history as part of the discussion of
context.

consider all relevant statutes together, so that they may be interpreted as a coherent, workable whole."). Taxpayer argues that the "price" of shisha must be determined on a "per-unit" or "per-item" basis because (1) cigarettes and moist snuff are taxed by the unit (the number of cigarettes or ounces of moist snuff net of container weight) and the tax on cigars is capped at a per-cigar maximum amount; and (2) the statutory scheme excludes markups and other additional charges in later transactions once shisha has been subjected to tax at any stage in the chain of transactions.

### a.    Parties' arguments

In its first argument based on context, taxpayer invokes the maxim *noscitur a sociis*, pointing out that for cigarettes, cigars and moist snuff, charges for shipping, federal taxes, warehousing, and other charges like the Charges at Issue are irrelevant. For moist snuff, even packaging is expressly excluded from the measure of the weight of the taxable tobacco product. Therefore, taxpayer argues, the legislature also intended to exclude those items from the tax base in the case of shisha and other tobacco products. The court, however, finds comparisons to the taxation of cigarettes, cigars, and moist snuff inapposite. At least as applied to the tax imposed by ORS 323.505(2)(c), the court sees no common thread that links tax bases measured by a unit of product or a unit of weight with a tax base measured by the price paid. And even if the court accepts taxpayer's conclusion that the legislature had a common concern of defining each tax base narrowly to include only the unit of product, the court still could not thereby deduce whether a particular stated price on a multi-item invoice accurately reflected the "consideration paid" for that unit.[5]

---

[5] The statutory development and legislative history provide no evidence of a common thread. Sales of cigarettes have been subject to an Oregon tax measured in mills per cigarette since 1965, comparable to the federal tax measured in dollars per one thousand cigarettes. *See* Or Laws 1965, ch 525, § 18 (tax on distribution); ORS 323.030 (tax on distribution); *cf.* IRC § 5701(c) (1965) (imposing federal excise tax on cigarettes based on dollar amount per thousand cigarettes within each of two weight classes). By contrast, when Oregon began to tax other tobacco products, pursuant to the TPT Act in 1985, the "wholesale sales price" was the sole tax base for all tobacco products other than cigarettes. *See* Or Laws 1985, ch 816, §§ 15‑16 (codified at ORS 323.500 and ORS 323.505 (1985 ed)) (imposing tax on all tobacco products at "35 percent of the wholesale sales price"). The shift to an essentially per-unit tax base for cigars occurred in 2001, but the legislative history of the

Taxpayer's second argument is based on the legislature's decision to not subject a product to tax if the product, or its "base product or other intermediate form," has been taxed. Here, taxpayer has a point. *See* ORS 323.505(5). As the department acknowledges, at each transaction in the chain of distribution the "price paid" for the tobacco product is likely to increase, if only by each successive seller's markup to gain a profit from the sale. Yet the statutes require the state to forgo taxing these increased amounts whenever an earlier transaction has been taxed. The court agrees that this statutory structure suggests that the legislature was less concerned about maximizing the size of the tax base and more concerned about ensuring that tobacco products do not go "untaxed" altogether.[6] It does not follow, however, that, at whatever stage the tax *is* imposed, the legislature intended to define "price" entirely by resort to the amount shown on an invoice containing numerous additional items.[7]

---

2001 act makes clear that the purpose of that change was to lower the tax on cigars in order to encourage purchases from compliant in-state retailers and to discourage purchases over the Internet from sellers that did not pay the tax. *See* Or Laws 2001, ch 982, § 3; Minutes, Senate Committee on Revenue, May 17, 2001, 8-9 (statement of Sen Witt) (explaining that local cigar stores have been going out of business due to the high tax rate). As for moist snuff, the change to a tax based on weight occurred after the 2003 redefinition of "wholesale sales price" and thus does not provide relevant context in this case. *See* Or Laws 2009, ch 717, § 2.

[6] The legislative history of House Bill (HB) 2368 (2003) supports this view, revealing that the legislature was primarily concerned with the lack of voluntary compliance with, and the department's inability to enforce, the TPT, which led to the widespread consumption of untaxed tobacco products. Audio Recording, House Committee on Revenue, HB 2368, Apr 24, 2003, at 38:35 (statement of Matt McCauley, Assistant Attorney General), https://olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID=2003041418 (explaining that the department could not enforce the TPT due to the lack of a licensing requirement for distributors); Audio Recording, Senate Committee on Judiciary, HB 2368, June 11, 2003, at 29:25-29:45 (statement of Matt McCauley, Assistant Attorney General), https://olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID=2003061039 ("We estimate that we're only receiving 20-30 percent of the revenue we ought to be receiving on [tobacco] products."). To solve that problem, the legislature imposed licensing requirements, granted the department the authority to suspend and revoke licenses, increased recordkeeping and filing requirements for distributors, and increased the number of people who are responsible for remitting the TPT by including consumers in possession of untaxed tobacco products in the definition of "distributor" and "distribution." *See generally* Or Laws 2003, ch 804, § 31 (definitions); *id.* § 34 (licensing); *id.* § 35 (suspending and revoking licenses); *id.* § 38 (record keeping); *id.* § 39 (record keeping).

[7] Taxpayer also argues that the statutory definition of "wholesale sales price" in effect from adoption of the TPT in 1985 until changed by the 2003 amendments supports its position that the current tax base, "price paid for untaxed tobacco

The department's contextual argument is that the legislature's declared intention that the TPT is "a direct tax on the consumer" resolves the issue. The complete text of the provision on which the department relies consists of three sentences:

"A tax is hereby imposed upon the distribution of all tobacco products in this state. The tax imposed by this section is intended to be a direct tax on the consumer, for which payment upon distribution is required to achieve convenience and facility in the collection and administration of

---

products," excludes all of the Charges at Issue. The pre-2003 statute provided: "'Wholesale sales price' means the established price for which a manufacturer sells a tobacco product to a distributor, after any discount or other reduction for quantity or cash." ORS 323.500(11) (1985). Taxpayer points initially to a Florida case construing similar language, in which the court concluded that "established price" excludes "various other *** invoice costs for reimbursement of federal excise tax, shipping costs, and other charges" because those charges "vary" depending on the buyer. *Micjo, Inc. v. Dep't of Business & Prof. Regulation*, 78 So 3d 124, 126-27 (Fla 2d Dist Ct App 2012). Second, taxpayer points to statements in the legislative history of the 2003 amendments to the TPT Act suggesting that the work group drafting the amendments did not intend to make "substantive" changes to the definition of "wholesale sales price":

"Essentially these were changes that as we got back in our workgroup with the tobacco manufacturers, the Department of Revenue, the Department of Justice, we realized that our initial drafting of the bill had left unclear a few things and essentially that's what the -2 amendments are, are these clarifying, adding a few words here and there that we thought were stronger or were more clear. I don't really believe that there's much that is substantive that appears in the -2 amendment."

Audio Recording, House Committee on Business and Consumer Affairs, HB 2368, Apr 11, 2003, at 55:22-57:00, *available at* https://olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID=2003041313; Exhibit H, House Committee on Business, Labor, and Consumer Affairs, HB 2368, Apr 11, 2003, at 5 (accompanying statement by Matt McCauley, Assistant Attorney General).

The court assigns no weight to McCauley's description of the amendments as "clarifying" and not "substantive." His statement may have been a fair response to what the committee chair asked of him—namely, to "hit the highlights" of the -2 amendments—but given the small amount of attention that the TPT Act changes received in relation to the rest of the bill, the court will not rely on McCauley's cursory summary of the -2 amendments to conclude that the legislature intended to preserve any part of the 1985 definition of "wholesale sales price." Those amendments were only some of the changes to the TPT Act, and the overall bill involved numerous additional changes involving the cigarette tax, which was the focus of the great bulk of the time in the hearings. *See* HB 2368 (2003) -2 amendments at 4-5 (proposing amendments to ORS 323.500); *see also* HB 2368 (2003) -3 amendments (proposing amendments pertaining to the cigarette tax); *see generally* Minutes, House Committee on Business, Labor, and Consumer Affairs, HB 2368, Apr 11, 2003. Without relevant legislative history connecting "price paid for untaxed tobacco products" to a concept of "established price," the court finds other courts' interpretation of the latter phrase irrelevant.

the tax. The tax shall be imposed on a distributor at the time the distributor distributes tobacco products."

ORS 323.505(1). The department reasons that each seller in the chain of transactions, starting with taxpayer, will charge a price sufficient to recover the Charges at Issue in order to make a profit, and the consumer therefore will end up bearing the economic cost of the Charges at Issue. From there, the department argues for an expansive reading of "price paid for untaxed tobacco products" that includes the Charges at Issue. However, the court simply finds no link between the phrase "direct tax on the consumer" and the term "price paid for untaxed tobacco products."[8] The analysis above shows that the TPT base is frozen at the first taxable transaction in the chain. *Consumers* ultimately may bear any number of costs that the distributor and later sellers incur, but *the TPT* applies to costs only if they are part of the "price paid for untaxed tobacco products."

The court does not read the "direct tax" statement of legislative intent in the second sentence of ORS 323.505(1) as overriding the declaration in the first sentence that "[a] tax is hereby imposed upon the distribution of all tobacco products in this state"; nor does it override the third sentence, which states that "[t]he tax shall be imposed on a distributor at the time the distributor distributes tobacco products." The first and third sentences, and the special definitions they incorporate, make it plain that the tax *operates* as a "direct tax on the consumer" only in those instances when the consumer receives tobacco products that have escaped taxation at all prior transactions in the chain.

Rather than view the second sentence as a guide to interpreting "price," the court finds it more plausible to read the second sentence as a signal or warning that the terms "distributor" and "distribution" are defined sweepingly—even to a counterintuitive extent—to include not only all manner of sellers and sales but also buyers, possessors, and users, including end users. The legislature's stated intention

---

[8] The phrase "direct tax on the consumer" appears also in the cigarette tax statutes. *See* ORS 323.085(2). However, neither party has proffered an explanation of its meaning or purpose, and the court has found no basis to conclude that the phrase has any connection with the measure of any tax base.

to treat the TPT as a "direct tax on the consumer" does not answer the question whether a particular Charge at Issue in this case is within or without the price taxpayer paid a supplier for untaxed tobacco products.

> b. Court's interpretation: Charges at Issue are excludible to the extent they are consideration for something other than tobacco products, and to the extent amounts are accurately allocated.

In sum, the court concludes that the parties' arguments based on context do not resolve whether the "price paid for untaxed tobacco products" includes or excludes the Charges at Issue. On a closer examination of the facts, the court distinguishes two issues in dispute. The first issue is whether any of the Charges at Issue should be separated from the price paid "for untaxed tobacco products." Taxpayer particularly emphasizes shipping charges, perhaps because shipping charges are commonly shown separately on the invoices from taxpayer's suppliers—as well as on invoices for goods generally. For example, some of taxpayer's invoices from suppliers list only line-item amounts for shisha and a line-item amount for shipping; taxpayer asks the court to exclude the line-item shipping amounts from the tax base. In addition to shipping charges, taxpayer seeks to exclude other Charges at Issue, such as warehousing or customs charges, that perhaps are not commonly shown separately on invoices.

The second issue is how to correctly allocate the total amount of a Charge at Issue among the items shown on an invoice. Taxpayer challenges the department's allocation of Charges at Issue among tobacco products and nontobacco products. For example, taxpayer complains that, when heavy nontaxable items such as hookahs or charcoal are shipped together with lighter-weight shisha, it is wrong to assign the total shipping charges to the shisha.

To resolve both of these statutory issues, the court returns to the plain and technical meaning of the "price paid for untaxed tobacco products," namely, the "consideration" given "for" untaxed tobacco products. Use of the term "consideration" in both the *Webster's* and *Black's* definitions suggests that the contract between seller and buyer is the

starting point. In this case, the contracts at issue involve the sale of goods, namely shisha that taxpayer buys from its suppliers. Therefore, for additional context, the court turns to the Uniform Commercial Code (UCC), as adopted by the Oregon legislature.[9] Several provisions of the UCC deal with shipping charges, one of the Charges at Issue. Unless the parties to a contract agree otherwise, the UCC provides that the seller's location is the place for delivery. *See* ORS 72.3080(1) (2003). When the contract requires delivery to occur elsewhere, other UCC provisions codify certain terms commonly used to assign the expense and other obligations of shipping by common carrier. *See* ORS 72.3190 - 72.3240 (2003) (describing F.O.B. and other arrangements when parties use a "carrier" to deliver goods). These provisions recognize that parties may bargain specifically as to the service of shipping the goods. The premise for this treatment appears to be the commercial reality that buyers and sellers of goods often entrust shipping to a common carrier rather than use their own vehicles. The UCC does not resolve either of the issues discussed in this section. However, as to the first issue—whether any Charges at Issue should be separated from the price for shisha—the UCC is statutory context that suggests the possibility that buyer and seller may reasonably view consideration for shipping as separate from consideration for the goods.

The court continues its focus on context relevant to the first issue. The court has not found other contemporaneous Oregon authority addressing whether a tax base measured by the consideration paid for goods can or should include charges for shipping services or other charges for which buyer and seller may bargain separately.[10] This is perhaps not surprising given the state's lack of a general

---

[9] Tobacco products appear to be well within the definition of "goods" under the UCC. *See* ORS 72.1050(1) (2003) (generally defining "goods" as "things \*\*\* movable at the time of identification to the contract \*\*\*").

[10] For example, although as of 2003, Oregon's statewide transient lodging tax long was imposed on the "consideration rendered for the sale, service or furnishing of transient lodging," the court has found no contemporaneous authority further defining the tax base. ORS 320.305(1) (2003); *cf.* ORS 320.305(1) (2019) (adding requirement that tax be "computed on the total retail price, including all charges other than taxes, paid by a person for occupancy of the transient lodging").

sales tax. Other jurisdictions imposing price-based taxes as of 2003 often addressed the issue by statute or by a legislative regulation with the force of law.[11] *See, e.g.*, IRC § 4216(a) (2006 ed) (for purposes of various federal manufacturing excise taxes, "[a] transportation, delivery, insurance, installation, or other charge * * * shall be excluded from the price only if the amount thereof is established to the satisfaction of the Secretary in accordance with the regulations");[12] Treas Reg § 48.4216(a)-2(b) (2003 ed) ("Charges for transportation, delivery, insurance, installation, and other expenses actually incurred in connection with the delivery of an article to a purchaser pursuant to a bona fide sale shall be excluded from the sale price in computing the tax."); *see also* Jerome R. Hellerstein & Walter Hellerstein, 2 *State Taxation* ¶ 15.06[1][b] (3d ed 2021) (in sales tax state, subject to significant exceptions, "the general rule is as follows: Transportation and delivery charges, if quoted separately to the buyer, are not included in the taxable price. If they are not separately stated, however, they are included in the taxable figure" (footnote omitted)).

In those sales tax states that lacked a specific statutory requirement to include or exclude shipping charges as of 2003, courts applied different tests to resolve the issue, including whether buyer and seller could contract for shipping separately from the sale of the goods, whether title or the risk of loss had passed to the buyer when shipping occurred, and whether providing shipping was "incidental" to, or "inseparable" from, the seller's business. *See, e.g.*,

---

[11] The court notes that, at one point in its briefing on constitutional issues, the department cites three current tobacco tax statutes of neighboring states, all of which use the price paid by the distributor as the tax base. Two of those statutes expressly define amounts like the Charges at Issue as part of the tax base. *See* Nev Rev Stat 370.440.7 (defining "wholesale price" as "price for which other tobacco products are sold to a wholesale dealer * * * *without any discount * * * on account of* * * * cost of materials used, labor * * *; cost of transportation * * *; shipping, freight, warehousing, customer service, advertising or any other service related to the sale; or [federal excise taxes]" (emphasis added)); Rev Code Wash 82.26.010(1) (defining "actual price" as "including any charges by the seller necessary to complete the sale such as charges for delivery, freight, transportation, or handling"). The third state does not use the general term "price," but instead uses the term "established price," which also appeared in Oregon's pre-2003 law. *Compare* Idaho Code 63-2551(7) *with* ORS 323.500(11) (1985).

[12] IRC section 4216(a) was not amended between 1984 and 2006. *See* ORS 323.500(10) (1985); *see also* IRC § 4216(a) (2000 ed) (same language).

*Southern Red-E-Mix Co. v. Director of Rev.*, 894 SW2d 164 (Mo 1995) (when considering whether delivery charges are included in the sales-tax base, the parties' intent is the most important factor; whether the parties intend for delivery charges to be part of the sale depends on when title passes, whether the charges are stated separately, who controls the means of delivery, who assumes risk of loss, and whether the seller benefits financially); *Material Service Corp. v. Dept. of Rev.*, 98 Ill 2d 382, 457 NE2d 9 (1983) (considering whether a fixed "minimum load charge" on deliveries of fewer than five cubic yards of concrete was indispensable or incidental to the sale); *Comptroller of Treasury v. John C. Louis Co., Inc.*, 285 Md 527 (1979) (concluding that, under certain conditions, separately stated shipping charges are excludable from the sales-tax base because they are not intended to be profitable for the seller); *see also* Hellerstein, 2 *State Taxation* at ¶ 15.06[3] (discussing cases).

Although this court does not discern in other states' cases a single or prevailing legal test, those cases, along with the context supplied by the UCC, persuade the court that, as of 2003, shipping by common carrier was sufficiently widely recognized as a service separate from the sale of goods that the Oregon legislature would not necessarily have considered shipping charges as part of the price paid for the goods, as the department asserts. The court has rejected above the parties' legal theories that would render the Charges at Issue either entirely taxable or entirely nontaxable as a matter of law. The court concludes instead, with respect to the first statutory issue, that Charges at Issue may be excludible from the price of tobacco products to the extent that they are consideration for something other than tobacco products. In this case of first impression, the court is left to develop its own test for that determination, and it does so below. Understandably, neither party has submitted evidence sufficient to apply the test,[13] and the court

---

[13] As to taxpayer's motion, after substituting the court's legal test in place of the test taxpayer advances, taxpayer could prevail only if no objectively reasonable juror could conclude that any amount of the Charges at Issue is includible in the "consideration for" shisha. *See* TCR 47 C. However, viewing the evidence in the light most favorable to the department, the court finds that a juror reasonably could conclude that some or all of the Charges at Issue are includible because neither party has submitted any evidence of what the Charges at Issue consist of,

therefore will deny each party's motion, enabling each party to present evidence, either at trial or by new motion, as to whether particular Charges at Issue are or are not part of the consideration paid for tobacco products.

The court adopts a "safe harbor," as well as a general rule, for purposes of resolving the first issue under taxpayer's statutory claim. Under the safe harbor, charges for shipping are excluded from the price for untaxed tobacco products to the extent that taxpayer's invoices from suppliers or other adequate evidence shows (1) that a supplier charged for shipping separately from the stated charge for shisha; (2) that a common carrier or other third party actually provided the shipping services; (3) the amount of shipping charges the supplier incurred separate from any other Charges at Issue; and (4) that the supplier passed on the shipping charges to taxpayer at no more than a reasonable markup.

To the extent that taxpayer seeks to exclude shipping charges that do not fit within the safe harbor, or to the extent that taxpayer seeks to exclude any other Charges at Issue, the court adopts the general rule that taxpayer must

beyond the mere labels appearing on the invoices. (For example, as to shipping charges, even those invoices that list shipping as a Charge at Issue, or as the sole Charge at Issue, generally do not show whether taxpayer's supplier used a third party or what markup the supplier added to the third party's charges.) As to Charges at Issue related to other types of services, none of the evidence reveals whether the services were performed by a third party, what markup the supplier charged, if any, or whether taxpayer held title to the shisha when the services were performed. As to charges other than for services, the mere labels do not inform the court of the nature of the charge, nor does the evidence show whether taxpayer held title to the shisha when the charges were incurred.

The same reasoning applies to the department's motion: Because the court concludes that Charges at Issue may be excludible based on the test stated below, and because neither party has proffered evidence on the factors in that test beyond the labels appearing on the invoices, a juror viewing the record in the manner most favorable to taxpayer could reasonably conclude that some or all of the Charges at Issue are excludible. Of the Charges at Issue, the record shows that some invoices had only "shipping" as a line item while other invoices do not have a line item for any of the charges. The fact that some of taxpayer's suppliers charged for shipping and others did not raises the possibility that these are separable charges, but the department has not provided any evidence that the shipping charges were inseparable from taxpayer's purchases of shisha. In addition, the invoices show that taxpayer purchased nontobacco products that were shipped along with shisha and to which some of the shipping costs may be appropriately allocated and, therefore, excluded from the tax base.

persuade the court that the 2003 legislature intended that those charges were not consideration paid for shisha. As with shipping, taxpayer's invoices from suppliers or other adequate evidence must at a minimum show that a supplier charged for the shipping or other Charge at Issue separately from the stated charge for shisha. The court will consider the following evidentiary factors: (1) charges for identifiable services are more likely to be excludible than charges not for services; (2) service charges are more likely to be excludible if a third party performed the services than if the supplier performed the services; (3) third-party service charges ordered by the supplier are more likely to be excluded if the seller passed on the charges at no more than a reasonable markup; and (4) charges are more likely to be excludible if title to the shisha had passed to taxpayer when the supplier incurred the charge.

      The court proceeds to the second statutory issue—allocation of Charges at Issue as between tobacco products and nontobacco products. The court anticipates that the factual analysis necessary to determine whether particular Charges at Issue are excludible from the price paid for untaxed tobacco products will also resolve many, if not all, allocation issues. For example, once a third-party shipper has been associated with a particular invoice, it may be possible to use that shipper's pricing protocols to determine a price for shipping 24 two-ounce jars of shisha separately from the shipping charge for six metal hookahs included on the same invoice. As a further means to verify the accuracy of an allocation on an invoice, the parties may present market evidence of the price or value of charges itemized on contract documents. A market-based approach would have been familiar to the Oregon legislature as of 2003, as income tax case law has long recognized a market-price-based approach to resolve disputes over the tax treatment of assets where buyer and seller have bargained at arm's length with respect to the *overall* contract price but lacked conflicting interests as to the allocation of the price *among* items in the contract.[14] *See, e.g., Particelli v. Comm'r*, 212 F2d

---

[14] The problem of determining the price paid for one asset in a multi-asset transaction arises in income tax law because the price paid for the assets is used to establish both the buyer's "basis" in the assets and the seller's "gain" or

498, 501 (9th Cir 1954) (reallocating total purchase price as between winery assets and wine) ("The total purchase price was arrived at through arms length negotiation but the allocation of the selling price to the two pieces of property involved was not. Once the parties had agreed upon the purchase price it was a matter of indifference to the buyer as to how the seller allocated it."); ORS 316.007 (1985) (declaring intention to make Oregon personal income tax law identical in effect to Internal Revenue Code provisions relating to measurement of taxable income); *see also Sleiman v. Comm'r*, 187 F3d 1352, 1361 & n 21 (11th Cir 1999) (reallocating buyer's basis as between nondepreciable land and depreciable improvements included in single transaction).

As with the first statutory issue, the court will allow the parties to present evidence, either at trial or by new motion, as to whether amounts taxpayer paid to its suppliers are accurately allocated to the price for untaxed tobacco products, as opposed to other, nontaxable items.

B.   *Constitutional Issue*

Taxpayer argues that the Commerce Clause prohibits Oregon from imposing the TPT on taxpayer for "at least some" of the periods at issue. *See* US Const, Art I, § 8, cl 3. Taxpayer asserts that its activities lack a substantial nexus with Oregon, based on taxpayer's lack of physical presence and low level of activity in the state; that the TPT is not fairly related to the services Oregon provides to taxpayer; and that the TPT unduly burdens interstate commerce. The department disputes each of taxpayer's arguments.

Under the "dormant" Commerce Clause, "state regulations may not discriminate against interstate commerce; and * * * States may not impose undue burdens on interstate commerce." *South Dakota v. Wayfair, Inc.*, 585 US ___, 138 S Ct 2080, 2091, 201 L Ed 2d 403 (2018). On the other hand, "State laws that 'regulat[e] even-handedly to effectuate a

---

"loss" from the sale. *See generally* Bittker & Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 41.6.8 (Mar 2021) ("Many sellers want to allocate as much of the purchase price as possible to assets that generate capital gain, such as goodwill. Buyers seek larger allocations to items to which the quickest cost recovery rules apply, such as inventory and equipment, which typically yield ordinary income for the seller.").

legitimate local public interest \*\*\* will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 US 137, 142, 90 S Ct 844, 25 L Ed 2d 174 (1970)). These principles "also animate the Court's Commerce Clause precedents addressing the validity of state taxes." *Id.* One such precedent, *Complete Auto Transit, Inc. v. Brady*, 430 US 274, 279, 97 S Ct 1076, 51 L Ed 2d 326 (1977), provides the "now-accepted framework for state taxation." *Wayfair*, 138 S Ct at 2091. Under the four-part test in *Complete Auto*, a state tax will be sustained so long as it "applie[s] to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto*, 430 US at 279. Taxpayer challenges the TPT under the first part ("substantial nexus") and the fourth part ("fairly related").

  1.  *Substantial nexus*

      In *Wayfair*, the Supreme Court both restated the substantial nexus requirement generally and, in the context of sales and use taxes, declared "unsound and incorrect" a "physical presence" requirement that the Court had imposed in two prior opinions. *See* 138 S Ct at 2099; *overruling Quill Corp. v. North Dakota*, 504 US 298, 317, 112 S Ct 1904, 119 L Ed 2d 91 (1992) and *National Bellas Hess, Inc. v. Ill. Dept. of Rev.*, 386 US 753, 758, 87 S Ct 1389, 18 L Ed 2d 505 (1967). In *Quill* and *Bellas Hess*, the Court had held that the substantial nexus requirement prohibited a state from requiring an out-of-state seller to collect a use tax from the seller's in-state customers, if the seller lacked a physical presence in the state. *See Quill*, 504 US at 309-19; *Bellas Hess*, 386 US at 758. Taxpayer argues that a physical-presence requirement applies to its activities, either for the reasons articulated in *Quill* and *Bellas Hess*, or because those decisions apply not only to sales and use tax, but also to the TPT; moreover, taxpayer argues that *Wayfair*'s overturning of the physical-presence requirement does not apply to this case because taxpayer's facts arose before *Wayfair* was decided in 2018. Because *Wayfair* is the Supreme Court's most recent

pronouncement on the Commerce Clause limitations on state taxation, this court first analyzes the Court's retroactivity case law, concluding that *Wayfair*'s holding does apply retroactively to this case. The court then considers whether the physical-presence requirement that *Wayfair* rejected for sales and use tax purposes nevertheless applies to the TPT, concluding that it does not. Finally, the court returns to *Wayfair* to determine how that case informs the analysis of substantial nexus for purposes of the TPT, a nonsales or use tax.

      a.   *Wayfair* applies retroactively

Taxpayer argues that, under the three-part test for civil actions pursuant to *Chevron Oil Co. v. Huson*, it would be inequitable for this court to apply *Wayfair* retroactively. 404 US 97, 106-07, 92 S Ct 349, 30 L Ed 2d 296 (1971) (Supreme Court opinion may be applied nonretroactively if (1) opinion announces "a new principle of law"; (2) nonretroactivity would avoid "injustice or hardship"; and (3) nonretroactivity would not unduly undermine the "purpose and effect" of the new rule). However, without expressly overruling *Chevron Oil Co. v. Huson*, the Court's more recent opinion in *Harper v. Virginia Dept. of Taxation* announced that "this Court's application of a rule of federal law to the parties before the Court requires every court to give retroactive effect to that decision." 509 US 86, 90, 113 S Ct 2510, 125 L Ed 2d 74 (1993). The Court further declared:

> "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and *must be given full retroactive effect in all cases still open on direct review and as to all events*, regardless of whether such events predate or postdate our announcement of the rule."

*Id.* at 97 (emphasis added). In its reply taxpayer argues that *Harper* is distinguishable:

> "*Harper* addressed whether a decision should be given retroactive effect by courts in other cases when the United States Supreme Court has decided to give the decision retroactive effect in the case before it. The Court held that when *it* chooses to apply a rule of federal law to the parties that are before the Court, then 'every court' has an

> obligation 'to give retroactive effect to that decision.' 509
> US at 90.
>
> "That is not what happened in *Wayfair*. When the Court
> decided to do away with *Quill*'s physical-presence require-
> ment in *Wayfair*, it did not have occasion to decide whether
> the new substantial-nexus rule should be applied retroac-
> tively to the parties before it because the statutory scheme
> at issue in *Wayfair* provided that the enforcement of the
> tax would be 'stayed until the constitutionality of the law
> has been clearly established.' *Wayfair*, 138 S Ct at 2089. As
> a result, the question whether *Wayfair* should be applied
> retroactively is still an open question."

(Emphasis in original.)

Taxpayer correctly points out that provisions in
the South Dakota law prohibiting retroactive assessments
if *Quill* were overturned meant that the Court could not
reach the question whether to apply its new substantial
nexus rule *retroactively* to the taxpayers in *Wayfair*. But
taxpayer's contention that *Wayfair*'s procedural posture cre-
ates an opening to apply a *Chevron Oil* test in this case is
based on a misreading of *Harper*. *Harper* does not hold that
a new rule may be applied on a prospective-only basis if
the Court does not determine, in the case in which the rule
is announced, that the rule applies retroactively. Rather,
both in the passages quoted above and elsewhere, *Harper*
repeatedly declares a general rule that the Court's holdings
apply with retroactive effect in other cases. *See* 509 US at 96
(Court's decisions in civil cases are "presumptively retroac-
tive"; "a rule of federal law, once announced and applied to
the parties to the controversy, must be given full retroactive
effect by all courts adjudicating federal law"). Nothing in
the Court's pronouncements limits this general rule to cases
in which the Court has applied the new rule to the parties
*retroactively*.

To be sure, the Court in *Harper* took pains to explain
that it had, in fact, applied a newly-announced rule to the
parties retroactively in *Davis v. Michigan Dept. of Treasury*,
489 US 803, 109 S Ct 1500, 103 L Ed 2d 891 (1989). *See id.*
at 97-99. However, the Court did so to explain its rejection of
the Virginia Supreme Court's rationale for not applying the
*Davis* rule retroactively in the decision from which *Harper*

was appealed. The Court in *Harper* did not appear to contemplate that a future case, such as *Wayfair*, might arise in which the Court would both announce a new rule and find it unnecessary to decide whether to apply that new rule retroactively to the parties. However, this court finds nothing in *Harper* that would justify an exception to the general rule. *Harper* traces the evolution of the Court's decisions on retroactivity and outlines many competing concerns, including the risk that retroactive application could create harsh results for litigants who have relied on a prior judicial rule; the problem of disparate treatment of litigants whose claims arise on one side or the other of the date a new rule is announced; and the role of the courts as interpreters, rather than creators, of the law. *James B. Beam Distilling Co. v. Georgia*, 501 US 529, 534-38, 111 S Ct 2439, 115 L Ed 2d 481 (1991). The weight of that analysis, and the absence of any exception on all fours with this case,[15] move this court to conclude that *Wayfair* must apply retroactively to the facts in this case.

---

[15] *Harper* does arguably recognize an exception to its general rule of retroactivity, grounded in its earlier decisions in *James B. Beam Distilling Co. and Bacchus Imports, Ltd. v. Dias*, 468 US 263, 104 S Ct 3049, 82 L Ed 2d 200 (1984):

> "When this Court *does not 'reserve the question whether its holding should be applied to the parties before it,'* however, an opinion announcing a rule of federal law 'is properly understood to have followed the normal rule of retroactive application' and must be 'read to hold . . . that its rule should apply retroactively to the litigants then before the Court.'"

*Harper*, 509 US at 97-98 (quoting *Beam*, 501 US at 539) (ellipsis in original; emphasis added). However, any exception based on "'reserv[ing] the question'" does not apply in this case. As used in *Harper* and *Beam*, the phrase refers to a decision to remand the case to the state court for the often complex task of determining whether the taxpayer before the Court is entitled to a remedy for overpayment of tax that the Court has determined was unconstitutionally imposed. The Court explained in *Beam* that a decision on retroactive relief to the taxpayer litigant may be "intertwined with, or obviated by, matters of state law," as in *Bacchus*, where the taxpayer's overpayment claim may have been mitigated to the extent the taxpayer was able to pass the tax through to its customers. *Beam*, 501 US at 538-39 ("Although the taxpaying appellants [in *Bacchus*] prevailed on the merits of their Commerce Clause claim, * * * the *Bacchus* Court did not grant outright their request for a refund of taxes paid under the law found unconstitutional. Instead, we remanded the case for consideration of the State's arguments that appellants were 'not entitled to refunds since they did not bear the economic incidence of the tax but passed it on as a separate addition to the price that their customers were legally obligated to pay.'"). In *Wayfair*, by contrast, the Court had no reason to "reserve" the question of retroactive application so as to let the state court determine the facts and sort the equities of retroactive relief. Accordingly, this court does not view *Wayfair* as fitting within a *Bacchus* exception.

b. Even in the absence of *Wayfair*, the *Quill*/*Bellas Hess* physical-presence rule does not apply for purposes of the TPT.

Even assuming that *Wayfair* does not eliminate the *Quill*/*Bellas Hess* physical-presence requirement retroactively, the court cannot conclude that any such requirement ever applied for purposes of the TPT. Both *Quill* and *Bellas Hess* involved use taxes, and the Court has not extended the physical-presence requirement to other types of taxes. *See Quill*, 504 US at 314, 317 (so stating as of 1992); *KFC Corp. v. Iowa Dept. of Rev.*, 792 NW2d 308, 320 (Sup Ct Iowa 2010) ("After *Quill*, the Supreme Court has generally avoided Commerce Clause cases involving the authority of states to impose taxes other than sales and use taxes on out-of-state entities with or without 'physical presence.' While there have been a number of cases in which the question has been squarely posed, the Supreme Court has repeatedly denied certiorari on them."); *cf.* Hellerstein, 2 *State Taxation* ¶ 19.02[2][b][vi] (following *Quill*, "it was by no means clear that the 'bright-line' physical-presence standard the Court reaffirmed * * * in the context of sales and use taxes applied equally to other taxpayers under other taxes. In the years following the *Quill* decision, however, the overwhelming majority of state courts that addressed the issue refused to extend *Quill*'s physical-presence test to income, franchise, and other taxes on business activity, and the Court's subsequent decision in *Wayfair* effectively put the question to rest." (Internal footnotes omitted.)). In considering whether to apply a physical-presence requirement to other types of tax assessments predating *Wayfair*, this court and others have considered two factors derived from *Quill* and *Bellas Hess*: whether assessing the tax against an out-of-state taxpayer lacking a physical presence in Oregon would impose an undue burden, and whether doing so would upend "settled expectations" on which out-of-state taxpayers have relied. *See Ooma, Inc. v. Dept. of Rev.*, 24 OTR 48 (2020), *aff'd*, 369 Or 95, 501 P3d 520 (2021) (E911 Tax); *Capital One Auto Finance Inc. v. Dept. of Rev.*, 22 OTR 326, 344-46 (2016), *aff'd on other grounds*, 363 Or 441, 423 P3d 80 (2018) (corporate excise tax and corporate income tax); *KFC Corp. v. Iowa Dept. of Rev.*, 792 NW2d 308, 324-35 (2010) (Sup Ct Iowa) (considering

reliance interests and potential burdens when deciding whether to apply the *Quill/Bellas Hess* rule to Iowa's income tax); *A & F Trademark, Inc. v. Tolson*, 167 NC App 150, 160-62, 605 SE2d 187 (2004), *cert den* 546 US 821, 126 S Ct 353, 163 L Ed 2d 62 (2005) (similar for North Carolina's corporate franchise and income taxes); *Tax Comm'r of State v. MBNA America Bank NA*, 220 W Va 163, 169-71, 640 SE2d 226 (2006) (similar for West Virginia's business franchise and net income taxes); *MBNA America Bank, N.A. & Affiliates v. Indiana Dept. of Rev.*, 895 NE2d 140, 144 (Tax Ct Ind 2008) (adopting the reasoning of *MBNA*, 220 W Va 163); *Lanco, Inc. v. Director, Div. of Taxation*, 379 NJ Super 562, 879 A2d 1234 (2005), *aff'd by* 188 NJ 380, 908 A 2d 176 (2006) (citing with approval *A & F Trademark*'s reasons for declining to extend the physical-presence rule); *see also* Hellerstein, 1 *State Taxation* ¶ 6.03[2][a] ("[T]he principal reasons for distinguishing sales and use taxes from other types of taxes are *** [t]he administrative difficulties for remote vendors in complying with tax collection obligations ***[;] [p]rinciples of *stare decisis*—specifically, the *** *Bellas Hess* [decision] establishing the physical-presence rule for use tax collection obligations for mail-order sellers ***[; and r]eliance interests that the physical-presence rule had engendered in the mail-order industry[.]" (Internal bullets, numbering, and italics omitted.)).

The burden analysis in use tax cases focuses on the requirement to collect the tax from customers and on the numerosity and variety of potential state and local taxing authorities nationwide to which the seller is required to report. *See Bellas Hess*, 386 US at 755 (detailing Illinois's requirements to collect tax, furnish receipts, remit tax, and maintain records); *Quill*, 504 US at 313 n 6 (6,000 reporting jurisdictions nationwide); *Capital One*, 22 OTR at 339 (collection burden "looms large" because "a taxpayer must ensure that the appropriate amount (and not more or less) is collected from the customer and directed to the appropriate taxing authority within the appropriate time"; taxpayer must be prepared to do so before making first sale into state). This court and others have rejected taxpayer arguments to extend a physical-presence requirement to income taxes because income tax laws do not require the taxpayer to

collect the tax from third parties and generally involve less time-sensitive reporting and remittance. *See Capital One*, 22 OTR at 338-40; *see also KFC Corp. v. Iowa Dept. of Rev.*, 792 NW2d 308, 325 (Iowa 2010), *cert den*, 556 US 817, 132 S Ct 97, 181 L Ed 2d 26 (2011) (declining to apply *Quill/Bellas Hess* rule to Iowa's income tax because "far fewer jurisdictions" are involved, taxpayer does not become "virtual agent of the state in collecting taxes from thousands of individual customers," and "tax assessments are only made periodically"); *Tax Com'r of State v. MBNA America Bank, N.A.*, 220 W Va 163, 170-71, 640 SE2d 226 (2006), *cert den sub nom FIA Card Services, N.A. v. Tax Com'r of West Virginia*, 551 US 1141, 127 S Ct 2997, 168 L Ed 2d 719 (2007) (declining to apply *Quill/Bellas Hess* rule to West Virginia's franchise and income taxes); *A & F Trademark*, 167 NC App at 161-62 (similar); *MBNA America Bank, N.A. & Affiliates v. Indiana Dept. of State Rev.*, 895 NE2d 140 (Tax Ct Indiana 2008) (similar).

Like an income tax law, and in contrast to a use tax law, the TPT Act does not impose an obligation to collect the tax from customers at the time of sale, hold the tax in trust, and remit it to the state within a short time. A taxpayer need only pay and file on a quarterly basis. *See* ORS 323.510.[16] Nor does the TPT Act ensnare taxpayers in multiple *local* tax regimes with varying rates or administrative, filing, or record-keeping obligations within the state. *See* ORS 323.640(1) (preempting local Oregon taxes). Taxpayer does assert that the totality of all states' tobacco products taxes, including Oregon's, poses an undue burden, but taxpayer refers only generally to the potentially 50 states, far fewer jurisdictions than at issue in *Quill* and *Bellas Hess*. *See Quill*, 504 US at 313 n 6 (referring to 6,000-plus sales and use tax jurisdictions). At oral argument, taxpayer's counsel responded to the question as to whether taxpayer

---

[16] The court notes that the TPT Act, like many sales tax laws, allows the taxpayer to retain 1.5 percent of the tax liability. *See* ORS 323.505(3); *cf. Bellas Hess*, 386 US at 764 n 7 (Fortas, J., dissenting) ("The Illinois statute provides for a 'discount of 2% or $5 per calendar year, whichever is greater * * * to reimburse the retailer for expenses incurred in collecting the tax, keeping records, preparing and filing returns, remitting the tax and supplying data * * *.'" (Quoting Ill Rev Stat C120, s 439.9 (1965) (ellipses in original).)). The department's Auditor Reports refer to the amount retained as "Distributor Compensation."

is making a "welter" argument similar to *Quill*, "we don't have the localities that were at issue; \*\*\*—here we are talking about \*\*\* different state laws." Taxpayer points to no authority suggesting that compliance with varying state-level taxes on the same or similar transactions constitutes a burden justifying extension of the *Quill/Bellas Hess* physical-presence rule, assuming *Wayfair* does not apply.[17] Taxpayer complains—with some justification—of the "idiosyncrasies" of the TPT, which to the court's mind would include defining the tax base by the amount the taxpayer pays to its supplier without specifying whether shipping and other charges are included. However, taxpayer presents no evidence that these features create anything approaching the burdens described in *Quill* and *Bellas Hess*.

Turning to the "settled expectations" factor, this court has questioned whether case law ever supported a reasonable expectation of a physical-presence requirement for taxes other than sales or use taxes. *See Ooma*, 24 OTR at 64; *Capital One*, 22 OTR at 343-44; *see also Quill*, 504 US at 314 (stating, as of 1992, "we have not, in our review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes"). However, even if a legal basis existed, taxpayer offers no evidence that it or other distributors have built their business around an expectation that the TPT would apply to them only if they established a physical presence in Oregon. *Cf. Quill*, 504 US at 316 (finding it "not unlikely that the mail-order industry's dramatic growth over the last quarter century is due in part to the bright-line exemption

---

[17] Even *Wayfair* allows for the possibility of varying taxes at the state level. The Court cited with approval the fact that the Streamlined Sales and Use Tax Agreement (SSUTA) had been adopted by "20-plus" states as of 2018. 138 S Ct at 2099-100. However, that number represents only about one-half the number of states imposing a general sales and use tax, meaning that some 20 other states had not pledged to conform to the SSUTA's agreed standards, including intrastate uniformity. Streamlined Sales Tax Governing Board, Inc., State Information, *available at* https://www.streamlinedsalestax.org/Shared-Pages/State-Detail (last visited July 21, 2021) (listing 23 full-member states, one associate-member state, and 28 nonmember states (including Washington D.C. and Puerto Rico)); Rute Pinho, *Streamlined Sales and Use Tax Agreement*, Office of Legislative Research (Connecticut) (July 13, 2018), *available at* https://www.cga.ct.gov/2018/rpt/pdf/2018-R-0182.pdf (listing 23 full-member states, one associate-member state, and 19 advisor states "that do not comply with the agreement but are non-voting members of its governing board").

from state taxation created in *Bellas Hess*"); *Capital One*, 22 OTR at 340-44 (considering taxpayer's argument citing eight instances in which Oregon acted, or failed to act, in ways that out-of-state banks could have relied on to conclude that physical presence was required for imposition of income-based taxes; finding no evidence of actual reliance by any taxpayer or industry generally). Rather, the evidence indicates that taxpayer, which has never had a physical presence in Oregon, has nevertheless complied with the TPT Act from the time it first began selling shisha to Oregon customers, and that taxpayer has successfully grown its Oregon sales significantly. Taxpayer has not demonstrated a "settled expectation" justifying extension of the *Quill/Bellas Hess* rule to the TPT.

The foregoing analysis suffices to persuade the court that pre-*Wayfair* law did not require a taxpayer to have a physical presence in Oregon as a prerequisite to imposition of the TPT. The court adds a final comment, relating to market distortion. The Court in *Wayfair* analyzed in detail the distortive effects that the Court's earlier decisions in *Quill* and *Bellas Hess* had had on the retail sales business. 138 S Ct at 2093-94. The Court found that the distortion caused by the physical-presence requirement was a major reason justifying abandonment of the requirement notwithstanding the doctrine of *stare decisis. Id.* at 2094 ("Rejecting the physical presence rule is necessary to ensure that artificial competitive advantages are not created by this Court's precedents."). The ability of out-of-state sellers to "offer *de facto* lower prices" by not collecting tax from their customers put locally based businesses at a disadvantage, among other problems. *Id.* In this case, adopting taxpayer's position would pose a particularly significant risk of market distortion because of the TPT's high rate. At 65 percent of the wholesale sales price, the TPT rate is approximately 10 times the rate of the South Dakota tax at issue in *Wayfair*, and around five times the highest sales and use tax rates nationwide. *See* SD Cod Law 10-45-2 (2021 ed; last amended in 2016) (combined state and local rates ranged from 4.5 percent to 6.5 percent); Jared Walczak & Scott Drenkard, *State and Local Sales Tax Rates, Midyear 2016*, Tax Foundation (July 5, 2016), *available at* https://

taxfoundation.org/state-and-local-sales-tax-rates-mid-year-2016/ (combined state and local rates nationally were below 10 percent). The result for which taxpayer contends in its constitutional argument—that *no* tax be imposed on taxpayer—would give taxpayer a cost advantage of up to 65 percent, compared to its taxpaying competitors. Therefore, even if other factors would suggest that a physical-presence requirement was needed in order to protect out-of-state sellers from an undue burden, imposing such a requirement might well amount to a judicially created market distortion of the type *Wayfair* rejected. *See* 138 S Ct at 2094.

> c. Did taxpayer have substantial nexus with Oregon during the Periods at Issue?

The court now returns to *Wayfair* to consider whether taxpayer's activities had a "substantial nexus" with Oregon. The Court in *Wayfair* discusses three levels of "nexus"—connection between an out-of-state seller's activities and the taxing state—that are relevant for Commerce Clause purposes.

> (1)  Levels of connection discussed in *Wayfair*

At the lowest level, an activity must have a "sufficient" nexus with the state to allow that state to treat the activity in the same manner as if the seller were an in-state taxpayer. *See Wayfair*, 138 S Ct at 2092. Establishing this level of nexus is necessary, but not sufficient, for a tax to survive Commerce Clause scrutiny. Classic examples of activities with sufficient nexus are sales of goods or services that are delivered within the state. *Oklahoma Tax Com'n v. Jefferson Lines, Inc.*, 514 US 175, 184, 115 S Ct 1331, 131 L Ed 2d 261 (1995). In this case, taxpayer's activities fit precisely within this level of "sufficient" nexus, making further discussion of this requirement unnecessary.

A second relevant level of nexus is the "minimum connection" that the Due Process Clause requires in order to subject the taxpayer to the state's jurisdiction. The Court in *Quill* suggested that the Commerce Clause test under *Complete Auto* "encompasses" Due Process requirements, such that every tax that survives Commerce Clause scrutiny also is valid under the Due Process Clause. 504 US at 313

n 7.[18] In *Wayfair*, the Court did not describe satisfaction of the Due Process standard as a prerequisite to survival of a tax under the Commerce Clause. However, the Court so strongly emphasized the close relationship and "significant parallels" between the Due Process and Commerce Clause standards that this court finds it appropriate to undertake a Due Process analysis as a check, after analyzing the third level of connection under the Commerce Clause. *Wayfair*, 138 S Ct at 2093; *see also* Hellerstein, 2 *State Taxation* ¶ 19.02[2][c][ii] ("By emphasizing the close affinity between the Due Process Clause and Commerce Clause nexus standards, the [*Wayfair*] Court effectively brought an end to the view, first introduced by *Quill*, that there are significant practical differences between the two."). At a minimum, if the Commerce Clause analysis indicates that imposition of the tax is permissible, but the Due Process Clause analysis indicates otherwise, then the court should reevaluate both analyses.

The third level of connection under the Commerce Clause is "substantial" nexus. The Court in *Wayfair* describes "substantial nexus" as requiring an "additional connection" beyond the level that is "sufficient" to justify taxation generally. *See* 138 S Ct at 2092-93. *Wayfair* notes that *Quill* "grounded the physical presence rule in *Complete Auto*'s requirement that a tax have a substantial nexus with the activity being taxed." *Id.* at 2092. *Quill*'s rationale for retaining a physical-presence requirement was to avoid imposing an "undue burden" on interstate commerce. 504 US at 314-18. *Wayfair* squarely repudiates the physical-presence requirement on its merits, declaring it "an incorrect interpretation of the Commerce Clause * * * both as first formulated and as applied today." 138 S Ct at 2092. More importantly for this case, *Wayfair* also appears to reject *Quill*'s linkage of the concepts of "substantial nexus" and "undue burden." The *Quill* approach seemed to imply that

---

[18] The converse is not necessarily true, however, as the Court in *Quill* rejected the taxpayer's Due Process challenge while invalidating the tax on Commerce Clause grounds. *See id.* at 305; *see also Comptroller of Treasury of Maryland v. Wynne*, 575 US 542, 556-57, 135 S Ct 1787, 191 L Ed 2d 813 (2015) (reiterating that states have jurisdiction under Due Process Clause to tax entire income of residents, but invalidating on Commerce Clause grounds state income tax whose partial credit for tax paid to other states failed to adequately protect against double taxation of same income).

a tax that more heavily burdens interstate commerce can survive Commerce Clause scrutiny only if coupled with a correspondingly more substantial connection with the state. By contrast, *Wayfair* states that, in the absence of *Quill* and *Bellas Hess*, "substantial nexus * * * is established when the taxpayer [or collector] avails itself of the substantial privilege of carrying on business in that jurisdiction." *Id.* at 2099 (citations and internal quotation marks omitted). To be sure, *Wayfair* discusses the burdens of sales and use tax collection requirements extensively, but it does so in the context of doctrines other than the substantial nexus requirement under *Complete Auto. See id.* at 2093 (explaining why post-*Quill* technological developments justify an exception to *stare decisis*); *id.* at 2099 (retroactivity); *id.* (*Pike* balancing test);[19] *see also* Hellerstein, 2 *State Taxation* ¶ 19.02[2][c][ii] ("The *Wayfair* Court also terminated *Quill*'s awkward marriage of the 'substantial nexus' prong of the *Complete Auto* Commerce Clause test with Commerce Clause undue burdens analysis.").

(2)    *Wayfair*'s substantial nexus test

As to the meaning of "substantial nexus" without the counterweight of a burdens analysis, the Court in *Wayfair* offers few clues, holding only that the annual in-state sales thresholds set in the statute at issue ($100,000 in sales or 200 "separate" transactions) represent a "considerable" amount of business in the state, and that none of the taxpayers could have achieved that quantity of business without "avail[ing] itself of the substantial privilege of carrying on business" in the state. 138 S Ct at 2098-99.[20] The Court's language

---

[19] As discussed above, the TPT does not impose the same burdens on distributers as use taxes impose on sellers because of the fewer number of taxing jurisdictions, the lack of an up-front collection obligation, and the quarterly filing requirement.

[20] The Court's holding included references to the taxpayers' "virtual" contacts with the state:

"Here, the nexus is clearly sufficient based on *both the economic and virtual contacts* respondents have with the State. The Act applies only to sellers that deliver more than $100,000 of goods or services into South Dakota or engage in 200 or more separate transactions for the delivery of goods and services into the State on an annual basis. S.B. 106, § 1. This quantity of business could not have occurred unless the seller availed itself of the substantial privilege of carrying on business in South Dakota. *And respondents are large,*

suggests that lower levels of sales may suffice for substantial nexus,[21] but *Wayfair* does not specify any minimum level. Supreme Court cases preceding *Wayfair* are of little help in identifying a dollar- or transaction-based threshold, as those cases generally either focus on whether particular facts satisfy the former physical-presence standard,[22] or dis-

---

*national companies that undoubtedly maintain an extensive virtual presence.* Thus, the substantial nexus requirement of *Complete Auto* is satisfied in this case."

*Id.* at 2099 (emphases added). This court does not, however, read *Wayfair* as requiring that an out-of-state taxpayer without physical presence have any sort of virtual presence as a necessary condition of "substantial nexus." By declaring that sales in excess of the South Dakota thresholds "could not have occurred unless the seller availed itself of the substantial privilege of carrying on business" in the state, the Court found the sales alone sufficient. *Id.* Moreover, the factual record in *Wayfair* contains no evidence about the taxpayers' online activity, in contrast to their sales activity, which the taxpayers expressly acknowledged exceeded one or both of the statutory thresholds. *See* Brief in Support of Defendants' Motion for Summary Judgment, *South Dakota v. Wayfair*, No. 3:16-V-03019-RA L (D SD July 22, 2016), 2016 WL 4709017 ("The facts confirm[] that each of the Defendants has no physical presence in South Dakota, does not report South Dakota sales tax, and had either $100,000 in gross revenues and/or 200 sales transactions for products delivered to customers in the State of South Dakota in 2015. No other facts are required to support the Defendants' right to judgment as a matter of law that the State's attempt to require them to collect South Dakota sales tax under S.B. 106 violates the Commerce Clause."). The Supreme Court's statement about the taxpayers' level of virtual presence simply reflects the Court's assumption, as the Court implicitly acknowledges with the word "undoubtedly." *Wayfair*, 138 S Ct at 2099; *see also* Hellerstein, 2 *State Taxation* ¶ 19.02 n 142 ("Clearly, a virtual presence (in the modern sense of having a website) is not required to establish substantial nexus. For example, a traditional mail-order company like National Bellas Hess, Inc. or Quill Corporation would have substantial nexus with South Dakota if its in-state sales or transactions exceeded the minimum thresholds prescribed by the South Dakota statute. In our view, the existence of a 'virtual presence' is simply a fact that supports a finding of substantial nexus, just as, in a simpler time, the *Quill* Court observed for due process purposes that there is little difference between a 'deluge of catalogs' and a 'phalanx of drummers.'").

Based on this reading of *Wayfair*, the court rejects taxpayer's argument that it lacks substantial nexus with Oregon because its virtual contacts with Oregon are minimal.

[21] *See id.* at 2098 (statutory thresholds represent a "considerable" amount of business in the state). For this reason, the court rejects taxpayer's argument that its activities lacked substantial nexus with Oregon because, at least in the early periods at issue, the dollar amounts of its sales and the numbers of its separate transactions fell below the thresholds at issue in *Wayfair*. The *Wayfair* thresholds are statutory and thus represent South Dakota's self-imposed limitations, not constitutionally required minimum numbers.

[22] *See, e.g.*, *Quill*, 514 US 298; *National Geographic Society v. California Bd. Of Equalization*, 430 US 551, 97 S Ct 1386, 51 L Ed 2d 631 (1977) (holding that California could impose a use-tax-collection obligation on a taxpayer with office

cuss nexus only as part of a Due Process inquiry or without clearly distinguishing between the Commerce Clause and Due Process Clause tests.[23] State-level decisions that might offer persuasive authority are similarly few in number, as those involving taxes other than sales or use taxes generally involve sales or transactions exceeding the statutory thresholds at issue in *Wayfair*[24] or were decided under different legal theories.[25]

---

buildings and employees in the state, even though the buildings or employees were not engaged in the activity California sought to tax); *Bellas Hess*, 386 US 753.

[23] *See, e.g.*, *Mobil Oil Corp. v. Commissioner of Taxes of Vermont*, 445 US 425, 100 S Ct 1223, 63 L Ed 2d 510 (1980); *National Geographic Society*, 430 US 551; *Standard Pressed Steel Co. v. Washington Rev. Dept.*, 419 US 560, 95 S Ct 706, 42 L Ed 2d 719 (1975); *General Motors Corp. v. Washington*, 377 US 436, 84 S Ct 1564, 12 L Ed 2d 430 (1964); *Portland Cement Co. v. Minnesota*, 358 US 450, 79 S Ct 357, 3 L Ed 2d 421 (1959); *Memphis Natural Gas Co. v. Stone*, 335 US 80, 68 S Ct 1475, 92 L Ed 1932 (1948); *Illinois Cent. R. Co. v. Minnesota*, 309 US 157, 60 S Ct 419, 84 L Ed 670 (1940); *see also* Richard D. Pomp, Revisiting *Miller Brothers*, *Bellas Hess*, and *Quill,* 65 Am U L Rev 1115, 1131 (2016) ("At the time of *Miller Brothers*, the Court and commentators did not think that nexus had a different meaning under the Due Process Clause than under the Commerce Clause—*Quill* would later invent that bifurcation.").

[24] *See Capital One*, 22 OTR 326 (holding that the taxpayer, who charged Oregon customers "nearly $150,000,000" and "sent approximately 24,600,000 solicitations to Oregon customers" in each year at issue, had a substantial nexus with Oregon); Hellerstein, 2 *State Taxation* ¶ 6.03[2][a][ii] (Ohio imposes a Corporate Activity Tax on taxpayers who lack a physical presence in the state if they have at least $500,000 in annual sales sourced to Ohio); *id.* ¶ 6.03[2][a][iii] (Michigan imposed its former business tax on taxpayers lacking a physical presence in Michigan if they had $350,000 in annual gross receipts sourced to Michigan); Hellerstein, 2 *State Taxation* ¶ 6.11[1] n 287 (listing economic nexus thresholds for Alabama, California, Connecticut, Michigan, Ohio, and Tennessee); *but see* Multistate Tax Commission, *Factor Presence Nexus Standard for Business Activity Taxes* (Oct 17, 2002), *available at* https://www.mtc.gov/uploaded Files/Multistate_Tax_Commission/Uniformity/Uniformity_Projects/A_-_Z/ FactorPresenceNexusStandardBusinessActTaxes.pdf (proposing uniform factor-presence nexus standards "for the collection of business activity taxes" if during the relevant tax period a business has $50,000 of property, payroll, or sales, or "twenty-five percent of total property, total payroll, or total sales," are sourced to the taxing state).

[25] *See, e.g.*, *Geoffrey, Inc. v. South Carolina Tax Comm'n*, 313 SC 15, 437 SE2d 13 (1993) (income tax; presence of intangibles within the taxing state created "substantial nexus"); *KFC Corp.*, 792 NW2d 308 (same); *A & F Trademark*, 167 NC App 150, (similar); *Joe E. Lanzi, III, Taxpayer v. State of Alabama Dept. of Rev.*, 2003 WL 22535609 (Ala Dept Rev) (holding that a nonresident taxpayer, whose only connection to the taxing state is a limited partnership interest in a resident limited partnership, does not have "substantial nexus" with taxing state based on entity theory of partnerships).

This court is left to apply the words of the Supreme Court to the facts of this case. A taxpayer's "avail[ing] itself" of the substantial privilege of "carrying on" business in a state implies intentionality and continuity. *Webster's Third New Int'l Dictionary* 150 (unabridged ed 2002) (defining "avail" in relevant part as "to take advantage: make use – used with *of*"); *id.* at 344 (defining "carry on" in relevant part as "CONDUCT, MANAGE <*carry on* the new enterprise>") (italics in original). This court finds both of those elements present on these facts. Taxpayer knew from its customers' shipping addresses that it was selling shisha into Oregon. *Cf. Asahi Metal Industry., Ltd. v. Superior Court of California, Solano County*, 480 US 102, 111-12, 107 S Ct 1026, 94 L Ed 2d 92 (1987) (plurality opinion of Justice O'Connor; concluding that "placement of a product into the stream of commerce, without more, is not an act * * * purposefully directed toward the forum State"). As soon as taxpayer began making sales into Oregon, it did so regularly, generally monthly, during all tax periods at issue.

The remaining term is "substantial." In *Wayfair*, that word is part of the term being defined ("substantial nexus"), as well as part of the definition ("substantial privilege"). The court views "privilege" as a binary concept: a state either grants the privilege of carrying on business, or it does not. There are, therefore, no minor, midrange, or maximum gradations of the privilege itself. There are, however, many gradations of business activity. This court interprets the *Wayfair* test to mean that a taxpayer whose activity rises to the level of "carrying on business" necessarily exercises a privilege that is substantial in character. Conversely, to avoid substantial nexus, the taxpayer's activities either must avoid the intentional connection with the state that is implicit in the term "avail," or the activities must lack the continuity implicit in "carrying on" business.[26]

---

[26] The phrase "substantial privilege of carrying on business" derives from cases decided on other constitutional grounds. The Court in *Wayfair* quotes the phrase as used in *Polar Tankers, Inc. v. City of Valdez*, 557 US 1, 8, 129 S Ct 2277, 174 L Ed 2d 1 (2009). *Polar Tankers* was decided exclusively under the Tonnage Clause, US Const, Art I, § 10, cl 3, and the Court in that case used the quoted phrase as a reference in passing to the Due Process test as articulated in *Mobil Oil Corp. v. Commissioner of Taxes of Vt.*, 445 US 425, 428, 100 S Ct 1223, 63 L Ed 2d 510 (1980) (income tax apportionment case). *Polar Tankers*, 557

The court concludes that, under *Wayfair*'s Commerce Clause analysis, taxpayer availed itself of the substantial privilege of carrying on business in Oregon in all of the periods at issue.

### (3)    Applying Due Process test as a check

Finally, the court applies a Due Process analysis to the facts of this case in order to test for a different result that might indicate a flaw in the Commerce Clause reasoning. Under the Due Process Clause, a court has specific, as opposed to general, jurisdiction over nonresident persons who have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Wash, Office of Unemployment Compensation and Placement*, 326 US 310, 316, 66 S Ct 154, 90 L Ed 95 (1945) (internal quotation marks omitted). "Minimum contacts" exist when a nonresident person "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 US 235, 253, 78 S Ct 1228, 2 L Ed 2d 1283 (1958). "Purposeful availment" refers to the nonresident person's deliberate actions, as opposed to "random, fortuitous, or attenuated contacts." *Burger King Corp. v. Rudzewicz*, 471 US 462, 475, 105 S Ct 2174, 85 L Ed 2d 528 (1985) (internal quotation marks omitted). A nonresident person fulfills the purposeful availment requirement when it has "deliberately * * * engaged in significant activities within a State or has created continuing obligations between himself and residents of the forum." *Id.* at 475-76 (internal citations and quotation marks omitted); *cf. World-Wide Volkswagen Corp. v. Woodson*, 444 US 286, 295, 100 S Ct 559, 62 L Ed 2d 490 (1980) (out-of-state automobile retailer and wholesaler did not have "minimum contacts" with forum state because they did not carry on any activity, make sales, perform services, solicit business, or advertise in the forum state, nor did they "avail themselves of [any] of the privileges and benefits

---

US at 11. *Mobil*, in turn, quotes the phrase as used in the Due Process Clause analysis in *Wisconsin v. J.C. Penney Co.*, 311 US 435, 444-45, 61 S Ct 246, 85 L Ed 267 (1940) (referring to the "substantial privilege of carrying on business in Wisconsin").

of Oklahoma law.").[27] By deliberately engaging in significant activities or creating ongoing obligations in a state, a nonresident person "should reasonably anticipate being haled into court there." *See World-Wide Volkswagen Corp. v. Woodson*, 444 US 286, 297, 100 S Ct 559, 62 L Ed 2d 490 (1980).

This is not a case in which taxpayer's products entered Oregon because of a "random" or "fortuitous" event. *See Burger King*, 471 US at 474-75. Nor is this a case in which taxpayer made "a single isolated sale" of shisha into Oregon. *See J. McIntyre Machinery, Ltd. v. Nicastro*, 564 US 873, 888-89, 131 S Ct 2780, 180 L Ed 2d 765 (2011) (Breyer, J., concurring in the judgment) ("[A] single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place.").[28] As discussed, even in 2008, taxpayer regularly sold and shipped shisha to Oregon retailers. *Cf. Volkswagen*, 444 US at 295 (no regular sales to in-state customers). The invoices for taxpayer's sales to Oregon retailers for 2008 show that taxpayer sold shisha to one Oregon retailer monthly from February 2008 to December 2008. Over time, taxpayer added more Oregon customers and made greater dollar amounts of Oregon sales. The court finds these activities sufficient to satisfy the "purposeful availment" and "minimum contacts" required for Due Process purposes. Taxpayer does not argue otherwise. It stated in its motion that "[taxpayer] certainly does have a nexus with Oregon in the sense that it does avail itself of the privilege of doing business in Oregon"; arguing its economic and virtual

---

[27] *See also Cox v. HP Inc.*, 368 Or 477, 506-09, 492 P3d 1245 (2021) (applying *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 592 US ___, 141 S Ct 1017, 209 L Ed 2d 225 (2021), in concluding that out-of-state party's "nontargeted internet postings" did not suffice to "create the relationship that due process demands" for specific jurisdiction over party).

[28] This case also does not involve sales to an intermediary in one location that distributes the goods to a state asserting jurisdiction. *Cf. Asahi Metal Industry., Ltd. v. Superior Court of California*, *Solano County*, 480 US 102, 107 S Ct 1026, 94 L Ed 2d 92 (1987) (differing opinions); *Willemsen v. Invacare Corp.*, 352 Or 191, 282 P3d 867 (2012) (sale of 1,102 wheelchairs including defendant's battery chargers established regular flow or regular course of sales justifying court's exercise of specific jurisdiction over defendant).

contacts with Oregon not "substantial" for Commerce Clause purposes.

### (4)   The department's waiver argument

The department points to taxpayer's decisions, before making its first sales of shisha into Oregon, to register with the department as a "distributor" of tobacco products and with the Secretary of State as a foreign business entity qualified to do business in Oregon, and to engage an Oregon registered agent to accept service on its behalf. The department argues that, by registering as a distributor, taxpayer "waived" any defense based on lack of nexus. The court rejects this argument, which is based on a line of sales tax cases from other states that involve so-called "voluntary" registration provisions in statutes or regulations. Those provisions provide a mechanism for unregistered remote sellers that claim immunity from tax to nevertheless start filing returns, thereby limiting their exposure to that state's tax, interest, and penalties. Such a provision preserves the taxpayer's argument that its contact with the taxing state is insufficient to subject the taxpayer to tax, which might be important if the taxpayer anticipates a dispute with another state with which it has a similar level of contact. Unsurprisingly, a taxpayer that registers pursuant to such a provision is required to follow through and actually collect and remit that state's tax; it generally will not be heard to argue that the tax does not apply to it. *See* Hellerstein, 2 *State Taxation* ¶ 19.11[3][a] (discussing cases). For purposes of this case, however, it is significant that a "voluntary registration" statute or regulation describes the registrant as "not engaged in business in [the taxing] state," or otherwise assumes that the registrant is immune from tax. 18 Cal Code Regs § 1684(b) (2001) (cited in *In Re B&D Litho, Inc.* 2001 WL 1034733, at *1 (Cal St Bd Equaliz May 31, 2001); *see* 18 Cal Code Regs § 1684(e)(2) (2021) (same); *see also* Ohio Rev Code § 5741.17(B) (1994) ("A seller who does not have nexus with this state may voluntarily register with the Commissioner." (Cited in *Dunhall Pharms., Inc. v. Tracy*, No. 94-T-1340, 1995 WL 640699, at *4 (Ohio Bd Tax App Oct 27, 1995).)). No comparable provision exists in the TPT Act.

The court concludes that taxpayer's activities satisfy all requirements for "substantial nexus" with Oregon under *Wayfair*.

2.  *"Fairly related" test under* Complete Auto

Taxpayer argues that the TPT is not fairly related to the services taxpayer receives from Oregon because the burden imposed on distributors "who conduct[] a relatively small amount of business in Oregon is disproportionately high compared to the benefits the distributor would ever gain from Oregon services." Taxpayer also argues that the TPT is "overly complex and idiosyncratic and thus increases [taxpayer]'s compliance costs disproportionately." As a result, taxpayer argues, it "is being asked to shoulder more than its fair share of the state's services." Moreover, "because [taxpayer] operates entirely outside of *** Oregon, it does not have the opportunity to avail itself of any of the services the tobacco tax revenues might fund." The department argues that the TPT is fairly related to taxpayer's activities in Oregon because it is measured "as a percentage of the 'wholesale sales price' of only that tobacco that enters Oregon."

The department is correct. Under the "fairly related" component of the *Complete Auto* test, the state need not provide a

> "detailed accounting of the services provided to the taxpayer on account of the activity being taxed, nor, indeed, is a State limited to offsetting the public costs created by the taxed activity. If the event is taxable, the proceeds from the tax may ordinarily be used for purposes unrelated to the taxable event. Interstate commerce may thus be made to pay its fair share of state expenses and 'contribute to the cost of providing *all* government services, including those services from which it arguably receives no direct benefit.'"

*Oklahoma Tax Com'n v. Jefferson Lines, Inc.*, 514 US 175, 199-200, 115 S Ct 1331, 131 L Ed 2d 261 (1995) (quoting *Goldberg v. Sweet*, 488 US 252, 267, 109 S Ct 582, 102 L Ed 2d 607 (1989)) (emphasis in original). Rather, as explained in *Commonwealth Edison Co. v. Montana*,

> "the fourth prong of the *Complete Auto Transit* test imposes the additional limitation that the *measure* of the tax must

be reasonably related to the extent of the contact, since it is the activities or presence of the taxpayer in the State that may properly be made to bear a just share of state tax burden."

453 US 609, 626, 101 S Ct 2946, 69 L Ed 2d 884 (1981) (emphasis in original). The tax at issue in *Commonwealth Edison* was a severance tax on the mining of coal, measured as a percentage of the "contract sale price." The Court had

> "little difficulty concluding that the Montana tax satisfies the fourth prong of the *Complete Auto Transit* test. The operating incidence of the tax is on the mining of coal within Montana. Because it is measured as a percentage of the value of the coal taken, the Montana tax is in proper proportion to appellants' activities within the State and, therefore, to their consequent enjoyment of the opportunities and protections which the State has afforded in connection with those activities. When a tax is assessed in proportion to a taxpayer's activities or presence in a State, the taxpayer is shouldering its fair share of supporting the State's provision of police and fire protection, the benefit of a trained work force, and the advantages of a civilized society."

*Id*. at 625-27 (internal footnotes, quotation marks, and citations omitted). Similarly, the TPT is fairly related to the extent of taxpayer's activities in Oregon because it is imposed only on the tobacco products that taxpayer distributes in Oregon. It is irrelevant whether taxpayer believes that it does not "avail itself of any of the services the tobacco tax revenues might fund" because "interstate commerce may *** be made to pay its fair share of state expenses and 'contribute to the cost of providing all government services, *including those services from which it arguably receives no direct benefit.*'" *Jefferson Lines, Inc*., 514 US at 199-200 (quoting *Goldberg*, 488 US at 267) (emphasis added). The court concludes that the "fairly related" component of the *Complete Auto* test is satisfied in this case.

3.    *Balancing test under* Pike v. Bruce Church, Inc.

The Court in *Wayfair* suggested that the "balancing framework" of *Pike v. Bruce Church, Inc.*, 397 US 137, 90 S Ct 844, 25 L Ed 2d 174 (1970), may be relevant in determining whether the Commerce Clause forbids imposition of a

particular state tax. *Wayfair*, 138 S Ct at 2099; *see also id.* at 2091 ("undue burden" analysis under *Pike* and other cases, one of two principles that "animate" state tax precedents under Commerce Clause); *Dept. of Rev. of Ky. v. Davis*, 553 US 328, 333, 128 S Ct 1801, 170 L Ed 2d 685 (2008) (referring to *Pike*, but deciding case on other grounds). Taxpayer in this case raises that issue, asserting that the TPT fails the *Pike* balancing test.[29]

Under *Pike*, a state law may violate the Commerce Clause if

> "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits. * * * [T]he extent of the burden that will be tolerated * * * depend[s] on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

397 US at 142. At issue in *Pike* was an Arizona law that prohibited the transportation of Arizona-grown cantaloupes that were not packed for shipment in the manner required by the Arizona Fruit and Vegetable Standardization Act. *Id.* at 138. A company that grew cantaloupes in Arizona challenged the constitutionality of the law under the Commerce Clause after Arizona ordered the company to cease shipping its cantaloupes from Arizona to its California packing facility, which was 31 miles away from where the cantaloupes were grown, because the company's California facility lacked "packing sheds" as required under the Act. *Id.* at 138-40. No compliant facilities were available in Arizona, and the cost

---

[29] Although it is appropriate to apply *Pike* balancing given the Supreme Court's statements in *Wayfair* and *Davis*, the court does so with little guidance specifically regarding state taxes. *See* Michael T. Fatale, *Wayfair, What's Fair, and Undue Burden*, 22 Chap L Rev 19, 49 (2019) ("What an undue burden litigation claim [under *Pike*] might look like [in a post-*Wayfair* tax case] * * * is an open question."); Jared Walczak and Janelle Cammenga, *State Sales Taxes in the Post-Wayfair Era*, Tax Foundation Fiscal Fact No. 680 32 (Dec 2019) ("That *Pike* has traditionally applied to regulatory analysis is not necessarily a barrier; the Supreme Court said in *Wayfair* that either the *Pike* balancing test or something similar to it may be an avenue for challenging overly burdensome remote sales tax regimes, *and while the contours of those limitations remain unknown*, the Court should be taken at its word." (Emphasis added.)); Walter Hellerstein and Andrew Appleby, *Substantive and Enforcement Jurisdiction In a Post-Wayfair World*, State Tax Notes 292 (Oct 22, 2018) ("Few courts have applied the *Pike* balancing test to analyze state tax laws, but it has been used frequently to analyze other types of state laws.").

to construct one would have amounted to approximately $200,000, while the gross value of the Arizona-grown crop was $700,000. *Id.* at 140.

The Court concluded that the law violated the Commerce Clause because the burden imposed on the company was clearly excessive in relation to the benefits to Arizona. *Id.* at 146. The Court described the benefits to Arizona:

> "The impetus for the Act was the fear that some growers were shipping inferior or deceptively packaged produce, with the result that the reputation of Arizona growers generally was being tarnished and their financial return concomitantly reduced. It was to prevent this that the Act was passed in 1929. The State has stipulated that its primary purpose is to promote and preserve the reputation of Arizona growers by prohibiting deceptive packaging."

*Id.* at 142-43. As for the burden imposed on the company:

> "The cantaloupes grown by the company [in Arizona] are of exceptionally high quality. The company does not pack them in Arizona and cannot do so without making a capital expenditure of approximately $200,000. \* \* \* [Arizona's] order would forbid the company to pack its cantaloupes outside Arizona, not for the purpose of keeping the reputation of its growers unsullied, but to enhance their reputation through the reflected good will of the company's superior produce."

*Id.* at 144. The Court concluded that "the State's tenuous interest in having the company's cantaloupes identified as originating in Arizona cannot constitutionally justify the requirement that the company build and operate an unneeded $200,000 packing plant in the State." *Id.* at 145; *see also id.* at 146 ("[T]he State's interest is minimal at best[.]").

Applying *Pike* to this case, the court starts with the benefits to Oregon from imposing the TPT. As with any tax, revenue generation is an obvious benefit to the state.[30] The court takes judicial notice that the TPT (including on cigars

---

[30] In *Wayfair*, the Court observed that the South Dakota tax at issue provided over 60 percent of the state's general fund, as the state had not adopted an income tax. *Wayfair*, 138 S Ct at 2088.

and moist snuff) in recent years has been budgeted to raise more than $30 million annually.[31]

Slightly less than one-half the TPT revenue is dedicated to programs to improve health. A 1997 law raised the TPT rate from 35 percent of the wholesale sales price to the present 65 percent and added a provision dedicating 41.5 percent of the revenue to the Oregon Health Plan and 4.62 percent to a "Tobacco Use Reduction Account" created in the same act. *See* Or Laws 1997, ch 2, §§ 9 - 15. Funds in that account are continuously appropriated for "prevention and education programs designed to reduce cigarette and tobacco use," including grants to educate children on the health hazards of tobacco use and grants to fund programs to prevent smoking-related diseases. Or Laws 1997, ch 2, §§ 13 - 14.

A distinctive feature of the TPT, as amended in 2003, is its application to virtually any transaction in the chain leading from manufacturer to consumer. The department argues, based on the legislative history of the 2003 amendments, that this feature reduces the number of sales that avoid tax altogether by allowing the department to enforce the tax as soon as products enter the state, and taxpayer does not refute this. The department stated in its response brief that "The purpose of the [2003] legislation was to strengthen and enhance taxpayer compliance with the cigarette and tobacco products tax laws, especially in the wake of increased online sales to Oregon customers. To that end, the legislature amended ORS 323.505(1) to provide that it intended the tobacco product tax to be * * * collected by the distributor as a matter of administrative convenience." (Footnote citing portion of legislative history omitted.)

The court compares these benefits to the state with the burdens the TPT places on tobacco product distributors. The court finds it significant that the Supreme Court in *Wayfair*, which twice mentioned *Pike*'s balancing test, apparently saw no need to apply that test to the South

---

[31] Oregon Economic and Revenue Forecast, Vol XXXIX, No. 1, Office of Economic Analysis 43-44 (Feb 27, 2019), *available at* https://www.oregon.gov/das/OEA/Documents/forecast0319.pdf.

Dakota tax before it. However, the Court commented favorably on South Dakota's annual thresholds of $100,000 in sales of goods or 200 "separate transactions" before the tax could apply, characterizing those amounts as "considerable," and "clearly sufficient" to establish a substantial nexus with the state. *Wayfair*, 138 S Ct at 2098, 2099. The Court also noted that South Dakota's tax (1) is administered solely at the state level; (2) has a simplified structure for accommodating varying local rates; (3) operates on state-provided compliance software that immunizes taxpayer users from audit liability; and (4) is uniform in important respects with the taxes imposed by the other 20-plus states joining in the SSUTA. *Id.* at 2099-100.

Comparing the burdens of the two taxes, the court first finds that both the TPT and the South Dakota sales tax are administered solely at the state level. As to the second factor above, the TPT outperforms the South Dakota tax by preempting *all* similar local Oregon taxes. *See* ORS 323.640(1). This is a marked simplification compared to the usual sales tax regime that allows cities, counties, and other local taxing districts to adopt local add-on rates that typically require software to determine the total rate to apply based on the buyer's shipping address. *See, e.g.*, Streamlined Sales and Use Tax Agreement (as amended through May 20, 2021) § 305(F) ("Each member state that has local jurisdictions that levy a sales or use tax shall[ ] [p]rovide and maintain a database that assigns the proper tax rates and jurisdictions to each five digit and nine digit zip code within a member state. * * * For the purposes of this section, there is a rebuttable presumption that a seller or CSP [(Certified Service Provider)] has exercised due diligence if the seller or CSP has attempted to determine the tax rate and jurisdiction by utilizing [state-provided] software * * *."). As to the third and fourth factors, the South Dakota tax appears comparatively less burdensome, as the department has not rebutted taxpayer's assertions that the department makes no software available, and that the TPT is "idiosyncratic" compared to other tobacco taxes. Furthermore, taxpayer complains of a general lack of published guidance as to how to determine the "price paid for untaxed tobacco products," at least at the time taxpayer was preparing its returns,

and the department has pointed to no publications or return instructions that would have addressed the question proactively.

The foregoing does not fully address the comparison, however. The South Dakota tax statutes at issue in *Wayfair*, like the use taxes at issue in *Quill* and *Bellas Hess*, required the taxpayer seller to determine the tax on each transaction "up front" and to promptly remit the collected tax to the state. South Dakota Codified Laws 10-45-27.3 (2021 ed) (absent an exception, requiring monthly remittance);[32] *State v. Wayfair Inc.*, 2017 SD 56, 901 NW2d 754, 756 (2017), *rev'd*, 138 S Ct 2080 (2018) ("Pursuant to state statute, sales tax is generally collected by sellers selling merchandise in this state at the point of sale ***."); 1991 North Dakota Laws, ch 681, § 2 ("If total sales and purchases subject to sales and use taxes for the preceding calendar year equal or exceed three hundred thirty-three thousand dollars, the tax levied by this chapter shall be payable monthly ***."); Illinois Laws 1955, at 2027-2037 (Illinois Use Tax Act), §§ 3, 9 (requiring retailers to collect tax from purchasers at time of sale and remit tax monthly); *see Quill*, 504 US at 302 ("North Dakota requires every retailer maintaining a place of business in the State to collect the tax from the consumer ***." (Internal quotation marks omitted.)); *Dept. of Rev. v. National Bellas Hess, Inc.*, 34 Ill 2d 164, 167, 214 NE2d 755 (1966), *rev'd*, 386 US 753, 87 S Ct 1389, 18 L Ed 2d 505 (1967) (citing 1955 Illinois Use Tax Act). *Wayfair* does not describe to what extent the state-provided software may have simplified these duties, but the fact remains that the South Dakota tax retained the standard use tax feature of deputizing sellers as collection agents. 138 S Ct at 2088; *see Capital One*, 22 OTR at 339-40 (juxtaposing sellers' collection burden associated with sales-and-use taxes and corporate excise and income taxes that have no such collection burden). The TPT Act does not do this.

On balance, the court finds the burdens imposed by the TPT Act no heavier than those in the South Dakota tax at issue in *Wayfair*. The benefits to Oregon from the TPT are manifest and are qualitatively at least as significant as the

---

[32] This statute was last amended in 2017.

benefits to South Dakota from its tax. The court concludes that the burdens imposed on out-of-state distributors are not "clearly excessive" in relation to the benefits to Oregon of supporting the General Fund programs that support most of the state's operations, as well the state's Medicaid plan and programs specifically related to the health hazards of tobacco use.

4.    *Department's "regulatory measure" argument*

After oral argument in this case, the Florida Court of Appeal issued an opinion in a case brought by taxpayer contesting imposition of Florida's "Tax on Tobacco Products Other Than Cigarettes or Cigars" on Commerce Clause grounds. *Glob. Hookah Distributors, Inc. v. Dep't of Bus. & Pro. Regul.*, 318 So 3d 613, No. 1D20-822, 2021 WL 1345233 (Fla Dist Ct App Apr 12, 2021), *reh'g denied* (June 8, 2021). The Florida court concluded that the tax at issue was a "regulatory measure enacted pursuant to this state's police power to protect the health of its citizens," citing statutes requiring proceeds of the tax to be used for certain health-related purposes. *Id.* at *3. The court relied on the Florida Supreme Court's statement that "[g]enerally speaking, statutes that represent the exercise of a state's police power are given less scrutiny under the Commerce Clause than those statutes enacted to raise revenue for the state." *Dep't of Banking & Fin., State of Fla. v. Credicorp, Inc.*, 684 So 2d 746, 750 (Fla 1996); *see* 2021 WL 1345233 at *4. Applying a more permissive Commerce Clause standard for regulatory measures, as set forth in *Credicorp*, the Court of Appeal in *Global Hookah* concluded that no physical-presence requirement applied. The court found it unnecessary to consider whether *Quill* or *Wayfair* applied. *See id.* at *2. Accordingly, the court upheld the tax assessment. *See id.* at *2.

Citing *Camps Newfound / Owatonna, Inc. v. Town of Harrison, Me.*, 520 US 564, 607, 117 S Ct 1590, 1613, 137 L Ed 2d 852 (1997), the department brought the Florida Court of Appeal case to this court's attention, arguing that the TPT Act is a regulatory measure comparable to the Florida tax and that a more permissive standard applies than addressed in the parties' earlier briefings. However, this court concludes that its holdings under the more stringent

standard for taxes under *Wayfair* make it unnecessary to address the department's argument.

## V.    CONCLUSIONS

The Charges at Issue are excluded from the "wholesale sales price" to the extent that they are consideration for something other than tobacco products and to the extent the amounts are accurately allocated. Taxpayer's activities of selling tobacco products to Oregon customers had a substantial nexus with Oregon during the periods at issue, and the measure of the TPT is fairly related to taxpayer's activity in Oregon. Imposing the TPT on taxpayer does not unduly burden interstate commerce. Therefore, imposing the TPT on taxpayer does not violate the Commerce Clause. For those reasons, now, therefore,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment is granted in part and denied in part with respect to the statutory issue and denied with respect to the constitutional issue; and

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment is granted in part and denied in part with respect to the statutory issue and granted with respect to the constitutional issue.